UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMERISURE MUTUAL
INSURANCE COMPANY,

Plaintiff,

v.

ALL CRANE RENTAL OF
GEORIGA, INC. and G.S.
CONSTRUCTION, INC.,

Defendants.

CIVIL ACTION NO.

1:22-CV-04022-SEG

## **O R D E R**

This case is before the Court on motions for summary judgment filed by

Plaintiff Amerisure Mutual Insurance Company (Doc. 53), Defendant G.S.

Construction, Inc. (Doc. 56), and Defendant All Crane Rental of Georgia, Inc.

(Doc. 58).  Having carefully considered the parties' arguments and applicable

law, the Court enters the following order.

## I.    **Introduction**

This is a declaratory judgment action concerning insurance coverage for

a damaged crane.  Defendant G.S. Construction, Inc. ("GSC") is a utilities

contractor, specializing in repairing and installing underground water pipes,

sewage pipes, and storm water pipes.  It is the insured of Plaintiff Amerisure

Mutual Insurance Company ("Amerisure").  Amerisure seeks a declaration

that it owes no duty to defend or indemnify GSC in connection with claims asserted by Defendant All Crane Rental of Georgia, Inc. ("All Crane") in Georgia state court for damage to the crane at GSC's worksite. Amerisure argues that certain exclusions in GSC's insurance policy preclude coverage for All Crane's claims against GSC. Most notably, Amerisure invokes a policy provision that excludes coverage for damage to property that GSC "rent[s]." (Doc. 1-1 at 87; Doc. 1-2 at 19.) For the following reasons, the Court finds that All Crane's claims against GSC arguably fall within the scope of GSC's insurance coverage and that Amerisure therefore has a duty to defend GSC in connection with those claims. The Court further finds that it would be premature to reach the question of the duty to indemnify, given that All Crane's state court lawsuit is yet to be resolved.

## II.    Background

### A. The Underlying Incident

On February 6, 2020, GSC was hired by the City of Decatur to replace underground storm drainage piping at an apartment complex. (Doc. 65, Amerisure Resp. to All Crane SOMF ¶ 14; Doc. 55, GSC 30(b)(6) Dep. at 22:11–15.) GSC required a crane for the completion of the project, but it does not own a crane and does not employ anyone who can operate a crane. (Doc. 66, Pl.

Resp. to GSC SOMF ¶¶ 11, 15–16; Doc. 56-4, Salvo Decl. ¶ 9.)[1] GSC therefore

contacted All Crane – a company with a "fleet of cranes" – about using one of

its cranes for the project. (Doc. 55, GSC 30(b)(6) Dep. at 23:17–21.) On April

6, 2020, All Crane prepared an "Equipment Rental Quote" for GSC based on

job specifications provided by GSC. (Doc. 53-6.) The document set forth

"Equipment Details" and "Equipment Rates," and it indicated that the crane

---

[1] Amerisure raises a general objection to the declaration of GSC's CEO and
30(b)(6) representative, Alessandro Salvo. (Doc. 66 at 2-3.) It argues that
Salvo's declaration is "conclusory" and "not the most reliable evidence
available," given that Salvo gave a deposition in this case. (*Id*. at 2.) In support
of its argument, Plaintiff cites to *Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271
(11th Cir. 2021), which states in relevant part:

> Courts have noted that "[t]he deposition of a witness will usually
> be more reliable than his affidavit, since the deponent was either
> cross-examined by opposing counsel, or at least available to
> opposing counsel for cross-examination." *Perma Rsch. & Dev. Co.
> v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). "Affidavits, on the
> other hand, are usually drafted by counsel, whose familiarity with
> summary judgment procedure may render an affidavit less
> credible." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253
> (3d Cir. 2007).

*Id.* at 1277, n.5. The Court overrules Amerisure's objection to the Salvo
declaration for several reasons. First, the assertions of fact in Salvo's
declaration cannot be fairly characterized as conclusory. Second, sworn
testimony based on personal knowledge can defeat summary judgment even if
it is self-serving. *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005).
Third, nothing in *Akridge* prevents a court from considering a declaration in a
case in which the declarant also gave a deposition. Finally, Plaintiff gives no
reason why Salvo's declaration should be considered unreliable. The objection
to the Baumgartner affidavit (Doc. 56-3) is overruled for the same reasons.

was to be "Operated/Maintained" by All Crane. (*Id.*) The document further provided various "conditions of rental and customer's responsibilities," including that the customer (*i.e.,* GSC) "is required to execute our standard form Equipment Rental Agreement which contains additional terms and conditions." (*Id.* at 7.)

GSC selected April 27, 2020, as the date on which All Crane would bring the crane to GSC's jobsite. (Doc. 65, Pl. Resp. to All Crane SOMF ¶ 15.) On that date, All Crane delivered the crane to the jobsite, accompanied by a crew of All Crane employees including two crane operators, a safety manager, and an oiler. (*Id.* ¶ 27.) A GSC employee confirmed receipt of the crane by signing a document prepared by All Crane. (Doc. 53-8.) The back of the document stated that the document was an "Equipment Rental Agreement" and set forth various "terms and conditions" to which the "Lessor and Lessee" agreed.[2] (*Id.*)

---

[2] GSC argues that it is not bound by the terms of the Equipment Rental Agreement because (1) the employee who signed the document, Amanda Barr, did not know that there were terms and conditions on the back of the document when she signed, and (2) Barr was a "traffic flagger" who did not have the authority to bind GSC. Whether GSC is bound by the terms and conditions of the Equipment Rental Agreement may be important in the underlying lawsuit against GSC, but neither side argues here that resolution of the issue is necessary in this declaratory judgment action.

4

At the jobsite, All Crane employees were responsible for assembling and disassembling the crane. (Doc. 72, Peck Dep. at 16:20–17:6.)[3] All Crane selected the crane to be used for the project and created the lift plan that the crane would execute. (Doc. 53-6 at 9; Doc. 74, Branscum Dep. at 11:20–12:1, 42:8–11.) An All Crane crane operator held the keys to the crane at all relevant times and was the only person who operated the crane at the jobsite. (Doc. 65, Pl. Resp. to All Crane SOMF ¶ 26.) A daily log prepared by GSC on the day of the subject incident listed All Crane among the "subcontractors [that] were onsite[.]" (Doc. 56-10.) The same daily log omitted the crane from its list of "rental equipment [that] was onsite" on the day of the incident. (*Id.*)

On April 27, 2020, around 4:55 p.m., the parking lot surface beneath the crane collapsed, creating a large hole into which the crane fell. (Doc. 65, Pl. Resp. to All Crane SOMF ¶ 19.) The crane incurred extensive damage. (*Id.*)

**B. GSC's Amerisure Insurance Policies**

At the time of the underlying incident, GSC was insured under two policies issued by Amerisure – a commercial package policy ("CPP") and an umbrella policy (the "Policies"). (Doc. 1-1; Doc. 1-2.) Both Policies provided

---

[3] The Court overrules Amerisure's general objection to the Peck and Branscum depositions. (Doc. 66 at 4.) Amerisure says GSC did not file the entire depositions. GSC has since done so. (Doc. 72, 74.)

commercial general liability ("CGL") coverage, and the relevant terms of the policies are the same. (*Id.*; Doc. 1 ¶¶ 7–8; Doc. 19 ¶¶ 7–8; Doc. 20 ¶¶ 7–8.) Under the Policies, Amerisure will defend and indemnify GSC with regard to any claim for "'property damage' to which this insurance applies." (Doc. 1-1 at 84; Doc. 1-2 at 16.) "Property damage" includes "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Doc. 1-1 at 98; Doc. 1-2 at 32.) There are certain exclusions to coverage that are discussed in greater detail below.

### C. All Crane's Lawsuit Against GSC

On July 22, 2020, All Crane sued GSC in the Superior Court of DeKalb County, seeking damages relating to the damaged crane ("the Underlying Lawsuit"). (Doc. 1-3.) All Crane alleged, *inter alia*, that GSC knew or should have known that there was a void beneath the subject parking lot but failed to inform All Crane of this hazard. (*Id.* ¶¶ 60–66.) The underlying complaint also alleged that, pursuant to the Equipment Rental Agreement, GSC was contractually obligated to indemnify All Crane against losses related to the crane. (*Id.* ¶ 73.) All Crane asserted claims for (1) "breach of contract and express indemnity obligations," (2) negligence, (3) negligent misrepresentation, and (4) attorneys' fees. (*Id.* ¶¶ 71–103.) Amerisure is currently defending GSC in the Underlying Lawsuit pursuant to a reservation

of rights.  (Doc. 55, GSC 30(b)(6) Dep. at 28:7–13.)  As of the time of this order's entry, the Underlying Lawsuit remains pending.  *See All Crane Rental of Georgia, Inc. v. G.S. Construction, Inc.*, 20CV5265 (Ga. Super. Ct.).

### D. The Instant Declaratory Judgment Action

On October 6, 2022, Amerisure filed this declaratory judgment action against GSC and All Crane.  (Doc. 1.)  Count I of Amerisure's complaint seeks a declaration that it owes no duty to defend GSC with respect to the claims in the Underlying Lawsuit.  (*Id.* ¶¶ 32–40.)  Count II seeks a declaration that Amerisure owes no duty to indemnify with respect to the same.  (*Id.* ¶¶ 41–49.)  GSC asserts two counterclaims against Amerisure.  (Doc. 19, Countercl.)  GSC's first counterclaim seeks a declaration that Amerisure owes a duty to defend and indemnify GSC in the Underlying Lawsuit.  (*Id.* ¶ 36.)  GSC's second counterclaim seeks fees and costs under Georgia's bad faith statute, O.C.G.A. § 33-4-6, and alleges that Amerisure filed this declaratory judgment action "despite knowing there to be coverage" for All Crane's underlying claims.  (Doc. 19, Countercl. ¶¶ 37–38.)  The parties engaged in eight months of discovery, and on November 8, 2023, all parties filed motions for summary judgment.  (Doc. 53, 56, 58.)

### III.   Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party.  *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir. 1999).  A fact is "material" only

8

if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson*, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246.

The same standard of review applies to cross-motions for summary judgment, but the Court must determine whether either party deserves judgment as a matter of law on the undisputed facts. *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242–43 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)). Each motion must be considered "on its own merits, [with] all reasonable inferences [resolved] against the party whose motion is under consideration." *Id.* at 1243.

## IV.   Discussion

The parties have filed cross motions for summary judgment seeking a determination as a matter of law as to whether Amerisure owes a duty to defend and indemnify GSC in the Underlying Lawsuit. Amerisure also seeks summary judgment as to GSC's bad faith counterclaim.

### A. Governing Principles of Georgia Insurance Law

Under Georgia law, an insurer's duty to defend claims against an insured is separate from its duty to indemnify. *S. Tr. Ins. Co. v. Mountain Express Oil*

*Co.*, 828 S.E.2d 455, 458 (Ga. Ct. App. 2019). With respect to the duty to defend, "the issue is not whether the insured is *actually liable* to the plaintiffs in the underlying action; the issue is whether a claim has been asserted which falls within the policy coverage[.]" *HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc.*, 701 F.3d 662, 666 (11th Cir. 2012) (quoting *Bituminous Cas. Corp. v. N. Ins. Co. of New York,* 548 S.E.2d 495, 497 (Ga. Ct. App. 2001)) (emphasis in original). An insurer's duty to defend arises for "any complaint that, if successful, might potentially or arguably fall within the policy's coverage." *Elan Pharm. Rsch. Corp. v. Emps. Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998) (citing *Penn–America Ins. Co. v. Disabled Am. Veterans, Inc.,* 490 S.E.2d 374, 376 (Ga. 1997)). It is the insurer's burden to show the applicability of a policy exclusion that it seeks to invoke. *First Specialty Ins. Corp., Inc. v. Flowers*, 644 S.E.2d 453, 455 (Ga. Ct. App. 2007).

"To determine whether an insurer owes its insured a duty to defend a particular lawsuit, Georgia law directs us to compare the allegations of the complaint, as well as the facts supporting those allegations, against the provisions of the insurance contract." *Elan Pharm.*, 144 F.3d at 1375. "An insurer can rely solely on the allegations contained within the complaint to establish that a policy exclusion precludes coverage." *Travelers Prop. Cas. Co. of Am. v. Kan. City Landsmen, L.L.C.*, 592 F. App'x 876, 882 (11th Cir. 2015)

(applying Georgia law). But if the underlying complaint fails to assert allegations sufficient to bring the claims within the scope of coverage, "a duty to defend may nevertheless exist where the insured informs the insurer of additional *facts* related to the claim that would entitle him to a defense[.]" *Shafe v. Am. States Ins. Co.*, 653 S.E.2d 870, 874 (Ga. Ct. App. 2007) (emphasis in original).

Finally, "[q]uestions of contract construction are matters of law and are properly handled by the court." *Great Am. All. Ins. Co. v. Anderson*, 847 F.3d 1327, 1331 (11th Cir. 2017) (applying Georgia law). "[W]hile coverage provisions are construed broadly in favor of the object to be accomplished, exclusions in an insurance policy are interpreted narrowly, in favor of the insured." *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 696 S.E.2d 326, 331 (Ga. Ct. App. 2010) (citations omitted). Where the claim is one of "potential coverage, doubt as to liability and [the] insurer's duty to defend should be resolved in favor of the insured." *Landmark Am. Ins. Co. v. Khan*, 705 S.E.2d 707, 710 (Ga. Ct. App. 2011).

## B. Whether the Underlying Lawsuit Alleges an "Occurrence" Within the Meaning of the Policies

Defendants GSC and All Crane seek summary judgment as to Amerisure's claim that the Underlying Lawsuit does not allege an

"Occurrence," within the meaning of the Policies. To be covered under the Policies, property damage must be caused by an "occurrence."[4] (Doc. 1-1 at 84, 94; Doc. 1-2 at 16, 31.) An "occurrence" is defined in the Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-1 at 98; Doc. 1-2 at 31.) The term "accident" is not defined in the Policies. When a term is not defined in an insurance policy, Georgia courts "look to the commonly accepted meaning of the term." *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 707 S.E.2d 369, 371 (Ga. 2011). "[I]t is commonly accepted that, when used in an insurance policy, an 'accident' is deemed to be 'an event happening without any human agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens . . . [I]n its common signification the word means an unexpected happening without intention or design.'" *Id.* (quoting Black's Law Dictionary, 15 (6th ed. 1990)); *see also City of Atlanta v. St. Paul Fire & Marine Ins. Co.*, 498 S.E.2d 782, 784 (Ga. Ct. App. 1998) ("An accident is an unexpected happening rather than one occurring through intention or design.").

---

[4] The Policies specifically state that: "This insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory[.]'" (Doc. 1-1 at 84; Doc. 1-2 at 16.)

Here, the Court concludes that the underlying event giving rise to All Crane's claims was an "occurrence." The crane was damaged when the parking lot surface beneath it gave way to the crane's weight and caved in. And though All Crane alleges in the Underlying Lawsuit that GSC "knew or should have known that there was a void beneath the existing pavement in the subject parking lot," (Doc. 1-3 ¶ 60), there is no allegation that the damage to the crane occurred because of GSC's "intention or design." *See, e.g., Maxum Indem. Co. v. Jimenez*, 734 S.E.2d 499, 503 (Ga. Ct. App. 2012) (holding that a pipe burst caused by an insured plumber's negligent installation was an "occurrence" because "[t]here was no evidence or suggestion that [the insured's] plumbing mistakes were expected or intentional.").

Amerisure posits that *"[i]f"* GSC "knew about the void under the parking lot and intentionally withheld that information from All Crane," then allegations relating to the crane's collapse would not be an "occurrence." (Doc. 64 at 6) (emphasis added). But that is a hypothetical argument. Amerisure does not point to any allegation in the Underlying Lawsuit to suggest that GSC intentionally (as opposed to negligently) withheld information about the void beneath the parking structure, or that it expected or intended for the crane to collapse into the void. The event at issue was an "accident" as defined in

Georgia law.  As a result, the Underlying Lawsuit alleges an "occurrence" that falls within the scope of coverage.

### C. Whether the "Damage to Property" Exclusion Applies

All parties have moved for summary judgment on the issue of whether the Policies' "Damage to Property" exclusion bars coverage for the underlying claims.  The exclusion precludes coverage for:

> "Property damage" to . . . [p]roperty you own, *rent*, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property[.]

(Doc. 1-1 at 87; Doc. 1-2 at 19 (emphasis added).)  "Property damage" includes, relevant here, "[p]hysical injury to tangible property, including all resulting loss of use of that property."  (Doc. 1-1 at 98; Doc. 1-2 at 32.)

To determine whether the Damage to Property exclusion applies, the Court starts with the exclusion's plain language.  No one argues that GSC "owned" or "occupied" the crane.  The only question is whether the crane was "property" that GSC "rent[ed]."  The parties' disagreement on this point is the central bone of contention in this case.  Amerisure argues that GSC's and All Crane's "Equipment Rental Agreement" is, as its title suggests, an agreement whereby GSC "rent[ed]" All Crane's crane.  GSC responds, *inter alia*, that (1)

the coverage issue is not controlled by the nomenclature in All Crane's form contract; (2) the evidence shows the crane was not "rented" as that term is understood under Georgia law; and (3) All Crane was not a *lessor* of the crane, but rather GSC's *subcontractor*.[5]

The word "rent" is not defined in the Policies, so we look to the "commonly accepted meaning of the term." *Am. Empire*, 707 S.E.2d at 371. Courts in Georgia have found that the commonly accepted meaning of the verb "rent," when used in an insurance contract, is "to grant the possession and enjoyment of in exchange for rent; to take and hold under an agreement to pay rent." *Empire Fire & Marine Ins. Co. v. Daniels*, 631 S.E.2d 799, 801 (Ga. Ct. App. 2006); *Row Equip. Sales & Rental, Inc. v. Grange Mut. Cas. Co.*, No. CV 511-099, 2012 U.S. Dist. LEXIS 134916, at *12 (S.D. Ga. Sep. 20, 2012) (stating, in discussion of a rented-property exclusion, that "an owner 'rents' his property to another if he voluntarily grants possession and use of the property to a person in exchange for that person's payment of a fee for the privilege of such possession and use."). In other words, an insured "rents" property when it obtains both the use and possession of the property in exchange for a rental fee. *See Row Equip. Sales*, 2012 U.S. Dist. LEXIS 134916, at *12 ("The

---

[5] All Crane, like GSC, contends that the Damage to Property exclusion is inapplicable in this case.

15

hallmark of a rental relationship is the payment of a rental fee for possession and use."); *see also* 9 Couch on Insurance § 126.18 ("For purposes of the liability insurance exclusion addressed here, it is the transfer of possession and control over property that is the key to determining whether the property has been leased to the insured. Consequently, a lease will not be found where physical possession and control of the property remain with the owner even where the parties refer to their agreement in regard to the property as a lease.") (citations omitted).  This accepted understanding of the term "rent," which the Court considers to be unambiguous, will inform whether the Damage to Property exclusion applies here.[6]

An insured who pays for both the temporary use of property and concurrent services may or may not be considered to have "rented" the property, depending on the circumstances.  For example, "[w]hile a person may 'rent' a car, it is generally said that a person 'hires' a taxi."  *Mewbourne Oil Co.*

---

[6] All Crane argues that the term "property" in the Damage to Property exclusion is ambiguous because it "does not distinguish between real and personal property" and should thus be construed as relating only to real property.  (Doc. 58-1 at 24.)  The Court is unpersuaded by this argument. Georgia courts have found similar rented-property exclusions to be unambiguous in the context of cases, like ours, dealing with personal property. *See, e.g., Daniels*, 631 S.E.2d at 802 (affirming trial court that declined to deem the term "rent" ambiguous in case involving coverage for a vehicle); *Row Equip. Sales*, 2012 U.S. Dist. LEXIS 134916, at *11 (finding the term "rent" to be unambiguous in case involving coverage for timber equipment).

*v. St. Paul Fire & Marine Ins. Co.*, No. CV H-09-2290, 2009 WL 10694904, at *7 (S.D. Tex. Dec. 8, 2009).  And "[a] person may rent power tools at a hardware store, but if a carpenter is hired to perform work at a house and she brings her own power tools to the house it would be unusual to say that the homeowner had rented the carpenter's tools."  *Id.*

In our case, the question is whether GSC "rented" a crane from All Crane when it arranged for both the temporary use of its crane and the services of All Crane's employees to operate and maintain the crane on the worksite.  The parties have not identified, and the Court has not found, any Georgia case addressing whether an entity "rents" equipment when it contracts for that equipment and its operating team to be brought to its worksite, in circumstances like those presented here.  But courts in other jurisdictions have grappled with such questions.

In *Crane Serv. & Equip. Corp. v. United States Fid. & Guar. Co.*, 496 N.E.2d 833 (Mass. App. Ct. 1986) – a case with facts similar to those presented here – the  court considered whether a policy exclusion for property "rented to" a general contractor barred coverage for damage to a crane.  The crane was owned by a company that the general contractor engaged to provide crane services at its worksite.  *Id.* at 834.  The court held that the crane was not

"rented" by the general contractor because the following facts suggested that the contractor lacked "possession and control" of the crane:

> Only [the crane company's] employees drove, operated, fueled, maintained, or repaired the equipment. Those employees kept the keys and were responsible for securing the machine. They could move the machine to another job and substitute equipment which was capable of the same work. Employees of the general contractor could direct where and when the crane should make lifts but that coordinating function is typical of the relationship between general contractors and subcontractors.

*Id.* at 835. The fact that the parties referred to the arrangement as a "crane rental" was not dispositive according to the court, which noted that "reference to a contractual arrangement as a 'lease' or 'rental' does not dictate its true nature." *Id.*

Other courts have similarly declined to enforce rented-property exclusions against insureds that lacked possession over the damaged property. *See, e.g., Dubay v. Trans-Am. Ins. Co.*, 75 A.D.2d 312, 317 (N.Y. App. Div. 1980) (finding that a "rented" property policy exclusion did not preclude coverage for a damaged crane where "[the crane company's] operator was at all times in charge of the controls of the crane, and [the contractor] never acquired physical possession of the crane."); *Northbrook Excess & Surplus Ins. Co. v. Coastal Rescue Sys. Corp.*, 182 Cal. App. 3d 763, 769 (1986) (holding that a helicopter was not "rented to" an insured where "[t]he management of the helicopter

18

remained with [the helicopter company] at all times"; "[the insured] had no control over the manner in which [the helicopter company's employee] piloted the helicopter"; and "[the employee] could have departed with the helicopter at any time.").

Some courts faced with analogous facts have reached the opposite conclusion, finding that a rented-property exclusion barred a contractor's coverage for damaged equipment, even when the equipment was operated by a third party. In *Caisson Corp. v. Home Indem. Corp.*, 502 N.E.2d 1168 (Ill. Ct. App. 1986), for example, a contractor was deemed not to have insurance coverage for damage to a concrete pumping truck that was owned by a third-party truck company. Although the truck was operated by a truck company employee, the contractor was nevertheless deemed to have had "possessory control" of the truck and to have "rented" it. *Id.* at 1170–71. The court noted that the contractor "strictly supervised the entire project" by, for instance, "determin[ing] which days the pumping truck would be used, how long the job would last each day, and when the operators should arrive and depart," and by providing other specifications that the truck operator was required to follow to complete the project. *Id.* And in *Atlantic Crane Service, Inc. v. S.G. Marino Crane Service, Inc.*, No. CIV-JFM-99-2681, 2000 WL 976810 (D. Md. June 19, 2000), an insured was found to have "rented" a crane when it signed an

agreement with a crane company providing that the crane was under the insured's "exclusive, full, and complete power, supervision, direction, and control during the Lease term," and there was "absolutely no evidence to demonstrate" that the insured was "not in actual possession of the crane." *Id.* at *2.

The cases above suggest that the question of whether equipment was "rented" is a fact-intensive inquiry that depends in part on the details of the contractual arrangement between the owner and the contractor. The fact that a machine is operated by a third party, as opposed to the insured, is relevant to the inquiry, *see Crane Serv. & Equip.*, 496 N.E.2d at 835, but it may not be the end of the story, particularly where other indicators of "possession" are present, *see Caisson Corp.*, 502 N.E.2d at 1170–71. And although the designation of a contract as a "rental" agreement is not dispositive, *see Crane Serv. & Equip.*, 496 N.E.2d at 835, the terms of the agreement may shed light on whether the insured exercised possessory rights over the relevant property, *Atl. Crane Serv.*, 2000 WL 976810 at *2.

With the foregoing legal principles in mind, the Court turns to the facts at hand. Amerisure argues that GSC rented the crane. It points the Court to the use of the term "rental" in two documents that are attached to the underlying complaint and which are central to the relationship between All

20

Crane and GSC.  Specifically, the document that All Crane used to convey its price quote to GSC featured in large font the words "Equipment Rental Quote" on all five pages.  (Doc. 1-3, Ex. C.)  Additionally, GSC's employee, Amanda Barr, signed a two-page "job ticket," acknowledging arrival of the crane on GSC's worksite.  (*Id.* ¶ 25, Ex. A.)  The reverse side of the "job ticket" had a header reading "Equipment Rental Agreement Terms and Conditions."  (*Id.*, Ex. A.)

Amerisure further points to certain acts by GSC that it says show that GSC used the crane, or exercised control over how and when it would be used.  For instance, the underlying complaint alleges that GSC employees were responsible for rigging the relevant structures onto the crane and for providing a qualified and experienced signal person.  (*Id.* ¶¶ 34, 42, 75.)  GSC identified the location of the work area where the structures would be placed with the crane.  (*Id.* ¶ 39.)  GSC determined the days on which the crane would be used.  (*Id.* ¶ 19.)  And in completing the project, All Crane was bound by the job specifications and requirements that GSC provided.  (*Id.*, Ex. C.)  For those reasons, Amerisure says, the agreement between GSC and All Crane was a rental agreement.

Defendants disagree, insisting instead that All Crane was GSC's subcontractor.  The question of whether GSC can be said to have "rent[ed]" the

crane is a close call, but for the following reasons, the Court finds that Defendants have the better argument here.

Some prefatory context about All Crane's business practices is necessary to frame the relevant facts. The undisputed evidence[7] shows that All Crane generally provides its cranes to customers under two types of agreements. (Doc. 56-2, GSC SOMF ¶ 19.)[8] The first is a "bare rental" agreement which means that All Crane delivers a crane to a worksite and leaves it with the customer, who must supply its own certified operator. (Doc. 56-2, GSC SOMF ¶ 20; Doc. 66, Pl. Resp. to GSC SOMF ¶ 20.) "Possession and custody of the crane are thus turned over to the customer, much like an individual who rents a car operates and takes custody of the car." (Doc. 56-1 at 20.) No one here argues that GSC and All Crane entered that kind of an agreement.

---

[7] While an insurer may rely solely on the allegations in the underlying complaint to establish that a policy exclusion applies, an insured may present "affirmative evidence in the declaratory action that the 'true facts show coverage.'" *State Farm Fire & Cas. Co. v. Brewer*, No. CIVA 106CV-2296-RWS, 2008 WL 450817, at *3 (N.D. Ga. Feb. 15, 2008) (quoting *Harden v. State Farm Fire & Cas. Co.*, 605 S.E.2d 37, 38 (Ga. Ct. App. 2004)).

[8] Plaintiff's objection to Paragraph 19 of GSC's statement of facts does not challenge the fact that All Crane "offers two types of agreements to customers." (Doc. 56-2 ¶ 19.) Plaintiff instead disagrees on the "terminology" All Crane uses to refer to each kind of agreement. (Doc. 66 ¶ 19.) It contends that both kinds of agreements are "rentals." (*Id.*)

The second type of arrangement that All Crane makes with a customer is one in which All Crane supplies a crane *plus* several employees (to include a crane operator) to perform a particular job. (Doc. 56-2, GSC SOMF ¶ 21).[9] The parties disagree on the terminology All Crane uses to refer to this second type of agreement,[10] but it is undisputed that the Equipment Rental Quote form in this case characterized the job as an "Operated/Maintained" agreement. (Doc. 53-6 at 6.)

Pursuant to Defendants' agreement, Defendants' course of dealings with each other and with the subject crane included the following aspects. All Crane chose the specific crane for the job – a Liebherr LTM 1160-5.2. (GSC SOMF, Doc. 56-2 ¶ 24.)[11] All Crane's salesman, Daniel Branscum, created a 3-D Lift

---

[9] Amerisure does not dispute, as a general matter, that All Crane enters agreements with customers, in which All Crane supplies a crane along with an operator. It objects instead to Defendants' characterization of the terminology All Crane used to refer to that type of arrangement. (Doc. 66, Pl. Resp. to GSC SOMF ¶ 21.)

[10] GSC says these agreements are "operated and maintained agreements." (Doc. 56-2, GSC SOMF ¶ 21.) Amerisure points to the deposition of All Crane's Rule 30(b)(6) witness, Jeremy Hunter, who instead refers to such agreements variously as "operated rental[s]" and "operated agreement[s]." (Doc. 66-1, Hunter Dep.) The Court does not consider the discrepancy material.

[11] Amerisure disputes this fact on the ground that "[t]he cited evidence does not support this statement of fact." (Doc. 66, Pl. Resp. to GSC SOMF ¶ 17.) In fact, the Salvo declaration supports it precisely. (Doc. 56-4, Salvo Decl. ¶ 17 ("Based on weight information provided by GSC, All Crane chose the specific

Plan for the job.  (Doc. 56-2, GSC SOMF ¶ 25; Doc. 56-4, Salvo Decl. ¶ 17.)[12]

On April 27, 2020, a crew of All Crane employees, consisting of a crane operator, safety manager, an oiler, and two drivers, arrived at the GSC jobsite. (Doc. 56-2, GSC SOMF ¶ 32; Doc. 56-4, Salvo Decl. ¶ 18.)  An All Crane employee drove the crane to the GSC worksite.  (Doc. 56-2, GSC SOMF ¶ 33; Doc. 56-4 Salvo Decl. ¶ 18.)  No GSC employee ever operated the crane.  (Doc. 56-2, GSC SOMF ¶¶ 42−43; Doc. 66, Pl. Resp. to GSC SOMF ¶¶ 42−43.)  David Peck, an All Crane employee, was the only person to operate the crane at the GSC worksite.  (*Id.* ¶ 42.)  Per Peck (the crane operator), it was one of Peck's job duties to "control the crane on site."  (Doc. 72, Peck Dep. at 22−23.)  An All Crane employee held the keys to the crane.  (Doc. 56-2, GSC SOMF ¶ 44; Doc. 66, Pl. Resp. to GSC SOMF ¶ 44.)  All Crane employees were responsible for assembling and disassembling the crane.  (Doc. 72, Peck Dep. at 16:20-17:6.)

And although All Crane referred to its contract with GSC as an "Equipment Rental Agreement," GSC points to evidence that it did not

---

crane for the job—a Liebherr LTM 1160-5.2, which could only be operated by an All Crane crew.").)

[12] Here again, Amerisure disputes the fact on the ground that the cited evidence does not support the statement.  It is incorrect; the Salvo declaration mirrors the stated fact.

consider the crane to be its rental property.  Specifically, a contemporaneous daily log prepared by GSC on the date of the incident expressly identified All Crane as a "subcontractor[ ]" and did not include the crane among the "rental equipment" that was present onsite.  (Doc. 56-10.)[13]

Amerisure's position is that All Crane's use of the word "rental" in the price quote and backside of the job ticket is conclusive of the intention of the parties.  The undersigned is of the view that Amerisure's position "ignores the on-the-ground facts." *Crane Serv. & Equip. Corp.*, 496 N.E.2d at 835.  As set forth above, those facts show that All Crane brought the crane to the site, assembled it, drove it, operated it, kept its keys, maintained it (with a staff of five) and dissembled it.  GSC did none of those things.  The above-listed facts are sufficient to show as a matter of law – notwithstanding the headings on All Crane's standard forms – that GSC did not have physical possession or control of the crane and did not "take" or "hold" it. *Daniels*, 631 S.E.2d at 801; 9 Couch

---

[13] Specifically, the daily log for April 27, 2020, contains the following notation in bold type: "Which subcontractors were onsite? For each sub note work performed and hours worked."  (Doc. 56-10 at 1.)  Underneath that heading, the log states in pertinent part: "All Crane Rental arrived at 9am." (*Id.*)  The same document also contains the following question in bold type: "What rental equipment was onsite?"   (*Id.*)   Underneath that heading, the log lists: temporary fencing panels, sandbags, a job box with rigging, ground release shackles, and many other items. (*Id.*)  All Crane's crane is not listed.

on Ins. § 126.18.  In sum, there are no material disputes of fact, and the evidence shows that GSC did not rent the crane as that term is understood under Georgia law.

The Court acknowledges that other courts considering similar contractual arrangements have reached mixed results on whether those arrangements were "rentals."  But the existence of a "close call" here weighs in GSC's favor on the ultimate issue of the duty to defend.  That is so because it is Amerisure's burden to show the Damage to Property exclusion "unambiguously exclude[s] coverage[.]"  *Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997).  And where, as here, a claim arguably falls outside the terms of the exclusion, coverage will not be barred by it.  *Nautilus Ins. Co. v. Flor*, 801 F. App'x 703, 708 (11th Cir. 2020) (exclusion did not bar coverage under Georgia law where the claim "at least arguably" fell outside the terms of the exclusion).  Put another way, the claim here potentially comes within the policy.  As such, any doubt as to the duty to defend is resolved in favor of GSC.  *Elan Pharm. Rsch.*, 144 F.3d at 1375 ("If the claim is only one of potential coverage, . . . any doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured.") (internal quotation marks omitted).  The Damage to Property exclusion does not bar Amerisure's duty to defend the claims in the Underlying Lawsuit.

**D. Whether the "Expected or Intended Injury" Exclusion Applies**

Defendants move for summary judgment on Amerisure's claim that the "Expected or Intended Injury" exclusion bars coverage. The Expected or Intended Injury exclusion excludes coverage for:

> "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

(Doc. 1-1 at 85; Doc. 1-2 at 17.) The Policies do not elaborate on what it means for property damage to be "expected or intended from the standpoint of the insured." But the Georgia Court of Appeals has said that the phrase "'expected or intended from the standpoint of the insured[ ]' clearly contemplates a subjective test as to the insured's intention." *Bates v. Guar. Nat. Ins. Co.*, 476 S.E.2d 797, 799 (Ga. Ct. App. 1996). Under this subjective test, an "expected or intended injury" exclusion will bar coverage only where the insured acts with the "specific intent to injure[.]" *Id.*; *see, e.g., Brayman v. Allstate Ins. Co.*, 441 S.E.2d 285, 286 (Ga. Ct. App. 1994) (holding that a policy exclusion for intentional acts applied where the insured allegedly made "false and malicious" statements that were "deliberately calculated to cause . . . harm").

Here, the "Expected or Intended Injury" exclusion does not apply for the reasons stated above in discussion of the "occurrence" policy term. Though All Crane alleges that GSC acted negligently with respect to the conditions that

27

led to the parking lot collapsing, there are no allegations or evidence that GSC

acted with the "specific intent" to cause damage to the crane. The Expected or

Intended injury exclusion does not unambiguously exclude coverage in the

Underlying Lawsuit.

### E. Whether the "Contractual Liability" Exclusion Applies

Amerisure and GSC move for summary judgment as to Amerisure's

claim that the Policies' "Contractual Liability" exclusion bars coverage. This

provision excludes coverage for:

> "Bodily injury" or "property damage" for which the insured is
> obligated to pay damages by reason of the assumption of liability
> in a contract or agreement.

(Doc. 1-1 at 85; Doc 1-2 at 17.) By its terms, this exclusion does not apply to

"liability for damages . . . [t]hat the insured would have in the absence of the

contract or agreement[.]" (*Id.*)

Amerisure argues that the Contractual Liability exclusion applies in this

case. In the Underlying Lawsuit, All Crane asserts claims for breach of

contract, negligence, and negligent misrepresentation against GSC. (Doc. 1-

3.) All Crane's breach of contract claim is based in relevant part on GSC's

alleged breach of the "Indemnification" provision of the Equipment Rental

Agreement, which states that GSC will "indemnify [All Crane] . . . against any

and all loss, damage, [or] cost . . . caused by . . . any act or omission of [GSC][.]"

28

(Doc. 53-8 at 5; Doc. 1-3 ¶¶ 74–75.)  According to Amerisure, any damages that GSC may become obligated to pay in connection with this contract claim would arise because of GSC's "assumption of liability in a contract" and would thus be excluded from coverage.  GSC responds that the Contractual Liability exclusion does not apply because All Crane's breach of contract claim seeks damages that GSC would be liable to pay even "in the absence of the contract or agreement[.]"  (Doc. 1-1 at 85; Doc 1-2 at 17.)

In *Maxum Indemnity Co. v. Jimenez*, 734 S.E.2d 499 (Ga. Ct. App. 2012), the Georgia Court of Appeals considered the reach of an identical contractual liability exclusion.[14]   In that case, an insured plumber was sued for his negligent installation of pipes that later burst.  *Id.* at 502.  The underlying complaint asserted claims for negligence, based on the plumber's defective workmanship, and breach of contract, based on the plumber's failure to indemnify the losses resulting from the defective workmanship.  *Id.*; *Jimenez v. Gilbane Bldg. Co.*, 693 S.E.2d 126, 127 (Ga. Ct. App. 2010) ("*Jimenez I*").[15]

---

[14] In *Jimenez*, the relevant exclusion stated that the policy did not cover "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  734 S.E.2d at 504.  The exclusion did not apply to liability for damages "[a]ssumed in a contract or agreement that is an 'insured contract'" or "[t]hat the insured would have in the absence of the contract or agreement."  *Id.*

[15] The Court relies in part on the recitation of the facts contained *Jimenez I*, 693 S.E.2d 126.  *See Jimenez*, 734 S.E.2d at 502 n.1 ("The background facts

29

Although the plaintiff sought damages arising from the plumber's contractual duty to indemnify, the contractual liability exclusion did not apply because the contract and tort claims were both "based upon [the plumber's] defective workmanship in the pipe installation and the resulting property damage[.]" 734 S.E.2d at 503. The plumber was entitled to insurance coverage because his "obligation to pay the damages award was not based upon a contractual assumption of liability, but rather, was based upon his tort liability arising from his own negligent pipe workmanship." *Id.*

*Jimenez* weighs in favor of Defendants' position. All Crane's breach of contract claim seeks damages resulting from the damage to its crane – the same damages sought in its negligence claims. (Doc. 1-3 ¶¶ 71–80.) As in *Jimenez*, these damages arose not from an assumed contractual liability, but rather from GSC's allegedly negligent conduct. *Cf. McDonald Construction Co. v. Bituminous Casualty Corp.*, 632 S.E.2d 420, 424 (Ga. Ct. App. 2006) (contractual liability exclusion barred coverage for costs that arose solely from the insured's contractual obligations, and "not from any tort liability that arose outside of the construction contract"). In other words, the property damage for which All Crane's breach of contract claim seeks compensation arose not from

---

and procedural history of the underlying case are as fully set forth in *Jimenez I*[.]").

the "assumption of liability in a contract[,]" but rather from GSC's alleged negligence. (Doc. 1-1 at 85; Doc. 1-2 at 17.) GSC's liability for damages would thus exist even "in the absence of" the indemnification provision that GSC allegedly breached. (*Id.*) The Court finds that the contractual liability exclusion does not bar coverage.[16]

### F. Whether the "Professional Services" Exclusion Applies

Defendants move for summary judgment on Amerisure's claim that the Policies' professional services exclusion bars coverage. This exclusion – which is labeled an "Engineers, Architects, or Surveyors Professional Liability" Exclusion – bars coverage for property damage "arising out of the rendering of or failure to render any professional services by [GSC][.]" (Doc. 1-1 at 110; Doc. 1-2 at 20.) The exclusion provides in full:

> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.
>
> Professional services include:

---

[16] Amerisure acknowledges that the only claim potentially barred by this exclusion is All Crane's breach of contract claim. (Doc. 79 at 11.) Under Georgia law, however, if there is a duty to defend *any* claim in the underlying action, there is a duty to defend *all* claims. *HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc.*, 701 F.3d 662, 666 (11th Cir. 2012).

    1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

    2. Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

(*Id.*)

Amerisure's sole argument in support of this exclusion rests on one sentence in the Underlying Lawsuit in which All Crane states that GSC "failed to have a geotechnical engineer present on the Project on April 27, 2020." (Doc. 64 at 9 (citing Doc. 1-3 ¶ 62).) Amerisure contends that this allegation implicates the professional services exclusion because, according to Amerisure, the policy provision excludes claims "related to an insured's alleged negligence in hiring of others[.]"[17]  (Doc. 64 at 9 (citing Doc. 1-1 at 110).)  But the plain language of the policy does not permit exclusion for an insured's mere failure

---

[17] Amerisure does not argue that any other part of the professional services exclusion is applicable.

to hire a certain kind of professional.  It instead bars coverage for property damage arising out of the rendering (or failure to render) professional services by: (1) *GSC itself;* or (2) any engineer, architect, or surveyor who is employed by GSC or performing work for it.  Amerisure does not allege that GSC itself failed to provide geotechnical engineering services.  And Amerisure points to no allegations that GSC employed any engineer, architect, or surveyor.

Additionally, even if the allegation that GSC "failed to have a geotechnical engineer present" fell within the scope of the professional services exclusion, that is only one allegation in a 103-paragraph complaint.  All Crane alleges that GSC was negligent in numerous other ways that Amerisure does not dispute constituted ordinary negligence unrelated to professional services. (*See, e.g.,* ¶¶ 63–66, 93 (alleging, *inter alia*, that GSC was negligent in failing to "inform ALL Crane . . . that there was a void under the surface area").) Because All Crane asserts claims that undisputedly fall outside the scope of the professional services exclusion, Amerisure "has a duty to defend all the claims asserted." *HDI-Gerling*, 701 F.3d at 666.[18]  Finally, to the extent that

---

[18] *See also* 14 Couch on Ins. § 201:74 ("When the underlying lawsuit alleges injuries resulting from the provision of both professional services and nonprofessional services, a professional services exclusion does not negate the [insurer's] duty to defend."); *First Mercury Ins. Co. v. Shawmut Woodworking & Supply, Inc.,* 48 F. Supp. 3d 158, 175 (D. Conn. 2014) (professional services exclusion did not apply where underlying lawsuits against contractors

there is any doubt as to the applicability of the exclusion, such doubt must be resolved in GSC's favor. *See Elite Integrated Med., LCC v. Hiscox, Inc.*, 553 F. Supp. 3d 1307, 1314–15 (N.D. Ga. 2021) ("[A]ny doubt as to liability and insurer's duty to defend should be resolved in favor of the insured.") (citation omitted). Amerisure has not shown that the facts alleged in the Underlying Lawsuit bring All Crane's claims within the scope of the professional services exclusion. Accordingly, coverage is not excluded by the professional services exclusion.

***

In sum, the Court finds that the underlying claims against GSC arguably fall within the scope of the Policies, and Amerisure has not shown that any exclusion unambiguously bars coverage. Amerisure therefore has a duty to defend GSC in the Underlying Lawsuit. GSC's and All Crane's motions for summary judgment are **GRANTED** as to Count I of Amerisure's complaint, and Amerisure's motion for summary judgment is **DENIED** as to the same.

### G. Duty to Indemnify

---

contained allegations of professional negligence *and* "general allegations of failure to warn"); *cf. Owners Ins. Co. v. Advanced Sleep Techs., Inc.*, 626 F. Supp. 3d 1350, 1356 (S.D. Ga. 2022) (finding that professional services exclusion applied where "the Underlying Lawsuit consist[ed] *only* of claims for 'professional services'") (emphasis added).

The parties' respective motions seek summary judgment as to Amerisure's duty to indemnify GSC in the Underlying Lawsuit. However, it is "too soon to say" whether Amerisure has a duty to indemnify GSC. *Capitol Specialty Ins. Corp. v. PTAV, Inc.*, 331 F. Supp. 3d 1329, 1338 (N.D. Ga. 2018). "Unlike with the duty to defend, the question of whether [Amerisure] is required to indemnify [GSC] might never arise if [GSC] defeats [All Crane's] claims in the first place." *Coca-Cola Sw. Beverages LLC v. Marten Transp., Ltd.*, No. 1:21-CV-4961-TWT, 2023 WL 5051353, at *5 (N.D. Ga. Aug. 7, 2023). Thus, Amerisure's "duty to indemnify is not ripe for adjudication in a declaratory judgment action until the insured is in fact held liable in the underlying suit." *PTAV, Inc.*, 331 F. Supp. 3d at 1338; *Citizens Ins. Co. of Am. v. Banyan Tree Mgmt., LLC*, 631 F. Supp. 3d 1256, 1268 n.5 (N.D. Ga. 2022), *aff'd*, No. 22-13581, 2023 WL 6319224 (11th Cir. Sept. 28, 2023) ("[I]t is possible that an insurer could have a duty to defend an insured but, at the conclusion of the underlying lawsuit, have no duty to indemnify. Accordingly, the Court will not consider the duty to indemnify as that issue is not yet ripe for adjudication."). Because the Underlying Lawsuit is still pending, Amerisure's claim for declaratory relief as to its duty to indemnify is not ripe. The Court will therefore dismiss Count II of Amerisure's complaint without prejudice. *See, e.g., PTAV, Inc.*, 331 F. Supp. 3d at 1338; *Zurich Am. Ins. Co.*

*v. Robinson Mech. Contractors, Inc.*, No. 1:20-CV-2236-LMM, 2020 WL 6821322, at *4 (N.D. Ga. Aug. 26, 2020).

### H. GSC's Bad Faith Counterclaim

Lastly, Amerisure seeks summary judgment on GSC's bad faith counterclaim, which alleges that "there is indisputably a duty to defend and indemnify with regard to the Underlying Action[,]" and that "Amerisure continues to contest coverage in bad faith." (Doc. 19, Countercl. ¶¶ 1, 38.) GSC asserts its counterclaim pursuant to O.C.G.A. § 33-4-6, which authorizes the award of certain penalties "when an insurer refuses to pay a covered claim 'in bad faith.'" *Greater Hall Temple Church of God v. S. Mut. Church Ins. Co.*, 820 F. App'x 915, 923 n.2 (11th Cir. 2020) (citing O.C.G.A. § 33-4-6).[19] The Georgia Court of Appeals has articulated the following guidance for determining whether an insurer's challenge to coverage is made in bad faith:

---

[19] The statute provides in relevant part:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

O.C.G.A. § 33-4-6.

> Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact. Ordinarily, the question of bad faith is one for the jury. However, when there is no evidence of unfounded reason for the nonpayment, *or* if the issue of liability is close, the court should disallow imposition of bad faith penalties. Moreover, the mere fact of nonpayment is not evidence of bad faith, nor is any burden thereby cast on the insurer to prove good faith. Rather, bad faith is shown by evidence that under *the terms of the policy* upon which the demand is made and under the facts surrounding the response to that demand, the insurer had no good cause for resisting and delaying payment. In addition, a defense going far enough to show reasonable and probable cause for making it would vindicate the good faith of the company as effectually as would a complete defense to the action.

*Taylor v. Gov't Emps. Ins. Co.*, 830 S.E.2d 235, 237 (Ga. Ct. App. 2019) (emphasis in original). Because O.C.G.A. § 33-4-6 imposes a penalty, "its requirements are strictly construed." *Am. Safety Indem. Co. v. Sto Corp.*, 802 S.E.2d 448, 456 (Ga. Ct. App. 2017).

The Court finds that the issue of coverage was close in this case, at least as to the Damages to Property exclusion. It was not "unfounded" for Amerisure to assert that the damaged crane was "rented" under the terms of the Damage to Property exclusion. As discussed above, there is no binding Georgia caselaw precisely on point, and Amerisure identified cases from other jurisdictions that supported its position. Although the Court ultimately resolved the issue in favor of Defendants, there is no evidence that Amerisure contested coverage in bad faith. *See, e.g., Phila. Indem. Ins. Co. v. First Multiple Listing Servs.*, 173

F. Supp. 3d 1314, 1324 (N.D. Ga. 2016) (granting summary judgment to insurer on bad faith counterclaim where there was a "lack of binding authority" on the contested coverage issue); *Sto Corp.*, 802 S.E.2d at 457 (holding that insurer was entitled to summary judgment on bad faith claim where the specific question of coverage "had not been squarely answered in Georgia"). As such, Amerisure's motion for summary judgment as to the bad faith counterclaim is **GRANTED**.

## V.    Conclusion

For the reasons set forth in this order, the parties' cross motions for summary judgment (Doc. 53, 56, 58) are **GRANTED IN PART** and **DENIED IN PART**. The Court finds as a matter of law and undisputed fact that Plaintiff has a duty to defend GSC in the Underlying Lawsuit. GSC's and All Crane's motions for summary judgment are granted as to Count I, and Amerisure's motion for summary judgment is denied as to the same.

The parties' cross motions for summary judgment are denied with respect to Count II, which is **DISMISSED WITHOUT PREJUDICE**. Amerisure's motion for summary judgment is granted as to GSC's bad faith

counterclaim (Count II of the Counterclaim).  As no matters remain pending before the Court, the Clerk is **DIRECTED** to close this case.[20]

      **SO ORDERED** this 29th day of August, 2024.

                                                    SARAH E. GERAGHTY
                                                    United States District Judge

---

[20] By virtue of its rulings on Counts I and II of the complaint, this order has also resolved the request for declaratory relief asserted in Count I of the Counterclaim.